## SCHUMAN v. BROOKLYN HEIGHTS R. CO.

(Supreme Court, Special Term, Queens County. February 17, 1909.)

1. NEW TRIAL (§ 77*)—SETTING ASIDE VERDICT—EVIDENCE.

A verdict should not be set aside, unless the court is satisfied that the jury were influenced by prejudice, passion, corruption, gross ignorance,

---

or mistake; but when the evidence is such that the court cannot believe the verdict to be the result of careful examination of the evidence, or when the verdict is the result of sympathy rather than of the weight of the evidence, or when the verdict is such that it could not have the approval of the court on appeal, it should be set aside.

[Ed. Note.—For other cases, see New Trial, Cent. Dig. § 157; Dec. Dig. § 77.*]

2. CARRIERS (§ 318*) — CARRIAGE OF PASSENGERS — INJURIES—ACTIONS—SUFFICIENCY OF EVIDENCE.
    Evidence in an action against a carrier for injury to a person attempting to board its train *held* insufficient to sustain a verdict for plaintiff.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 1313; Dec. Dig. § 318.*]

Action by Michael Schuman against the Brooklyn Heights Railroad Company. Verdict for plaintiff, and defendant moves to set the verdict aside as against the weight of the evidence. Motion granted.

Edmund C. Vemeister, for plaintiff.

George D. Yeomans (Thomas L. Hughes, of counsel), for defendant.

JAYCOX, J. Upon this motion to set aside the verdict of the jury the plaintiff's very earnest counsel very persistently and forcibly urges that the verdict should not be set aside, unless the court is satisfied that the jury were influenced by prejudice, passion, corruption, gross ignorance, or mistake. With that I agree. I am further of the opinion, however, that, when the evidence is such that the court cannot believe the verdict to be the result of careful examination of the evidence, it should not hesitate to set the verdict aside. Especially is this true when it is patent to the court that the verdict must have been the result of sympathy, rather than the result of the weight of evidence. It is only fair, too, that in the event of an appeal the verdict should not have the approval of the court, unless the court feels that it is entitled to such approval. On the present case I do not think the verdict should have the approval of the court, which is inferred from the denial of a motion to set it aside. The plaintiff's injuries were severe, and were such as to arouse the sympathy of the most hardened, and the jury, in my opinion, were unable to free their minds from the influence of this sympathy.

Besides himself, the plaintiff had two witnesses to the happening of the accident. The plaintiff testifies, in his own behalf, that the train which he attempted to board was a six-car train; that he approached it nearly opposite the forward end of the first car; that he then walked past five cars, and attempted to board the train at the opening between the fifth and sixth cars; that he walked by all of these cars, because of the large number of people on the platform about to board this train. The evidence afterward introduced by the defendant shows that after the train left this section there were only 30 passengers on board of it. Undoubtedly some of these passengers entered the train at two previous stations at which it stopped; but, assuming for the purpose of this opinion that they all entered the train at this station,

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

there were then 5 openings at which passengers were admitted. At each opening there were two sets of steps, making 10 sets of steps to admit 30 passengers. There would, therefore, be only 3 passengers to each set of steps. This evidence as to the number of passengers, I think, must be accepted as true as it is derived from the records of the company, made, not for the purpose of this action, but for the purpose of a check on the collectors of fares, to see that they turned in all of the fares to which the company was entitled. The excuse, therefore, or the explanation of why the plaintiff walked by these openings, in my opinion, falls to the ground. He then says that when he attempted to board the train the guard shut the gate, which struck him in the breast and threw him off; that as he was going off the train started; that he grabbed the handle on the corner of the car and was dragged some distance. Now, it is a conceded fact that the gates to these cars would not close unless the trapdoor over the steps was let down; and plaintiff takes the position that the guard attempted to close the gate with this trapdoor up and that it would then close far enough to come in contact with the body of the plaintiff. There is no testimony that I remember bearing absolutely upon the position of the trapdoor. It is only the inference which the plaintiff seeks to draw that the trapdoor must have been up; otherwise, he could not have stepped upon the car. But it is highly improbable that the guard attempted to close the gate with the trapdoor up. Nothing would be gained by such an attempt, and the gate would have to be opened again and the trapdoor lowered. Further, if the plaintiff stepped up two steps, as he testified that he did, the gate would not come in contact with his body, but would strike his legs.

The method of starting the train, it is conceded, or at least is not disputed, is by means of bells. The trainman at the rear entrance— that is, the entrance between the fifth and sixth cars—when his gateways are clear, pulls the rope, which rings the bell upon the forward part of the fifth car. The trainman between the fourth and fifth cars then in turn pulls the rope on the rear of the fourth car, which rings the bell upon the forward part of that car, and the signal is thus transmitted to the first car. The trainman then rings the bell on the front of the car as a signal to the motorman to start the train. This is the usual and customary way of giving the signal to start all such trains on the elevated and in the subway. At this particular station, in addition to these signals, the motorman was required to receive from the flagman in front of the train a signal that the road is clear, and after receiving that signal he starts the train. Under such a system of signaling it is impossible to understand how, if the plaintiff was following closely after other passengers getting aboard this train, this signal could have been transmitted from this rear car to the motorman at the front of the train, so that the train started at the same instant he attempted to board it.

Of the two witnesses who testified in his behalf, one was a woman, who testified that she had been leaning out of her window watching what was occurring in the street on a morning in January for nearly one hour before the happening of the accident. She testifies that she saw just the attempt of the plaintiff to board the train, and then that,

seeing that an accident was happening, she did not wish to subject herself to the shock of watching it, and that she drew her head in and saw nothing further of what happened; that she did not have curiosity enough to endeavor to ascertain in any way whether the young man was injured, or killed, or what became of him, or who he was. The testimony shows that she afterward moved from this neighborhood, and there is nothing to indicate in any way how the plaintiff became aware of the fact that she saw the accident, or how her address was learned in time to subpœna her for trial. To my mind the facts that she testified that in the coldest part of the year she remained with her head out of the window nearly an hour merely to satisfy her curiosity as to occurrences in the street, and when something did happen worth looking at she drew her head and paid no further attention, makes her testimony highly improbable. There was nothing about her appearance on the stand that indicated that she was of such a delicate organization as to cause one to believe that she would be severely shocked by the observation of an accident; and even if such was the case, an ordinary interest in a fellow being would require a person of ordinary feelings to make some inquiries as to the extent or character of his injuries. The other witness tells a story which in some respects is still more extraordinary. He came out of his house opposite this station just as the plaintiff was about to board the train. He apparently was in a hurry; but, although his course was to the right, he looked to the left and saw the young man attempt to board the train, and claims to have seen the gate slammed against him, and to have seen the train start and plaintiff fall. The train then went the same course along the same street that he was going: but he had no further interest in the matter, and, although this plaintiff was being dragged by this train right to him, he never looked to see it, and knew nothing of what happened to him; that he went to the corner of the street, turned up, and went to the baker shop. This was practically all of the testimony in behalf of the plaintiff.

The defense called every trainman, and they all testified that they knew of no accident at this station at the time; that they saw no one attempt to board the train who did not get aboard; that they slammed the gate against no passenger and pushed him off. Upon the return of the train to this station, after making the trip to the Brooklyn Bridge, they learned of the accident. The defendant called a man who conducted a news stand which was concededly where he could see this accident, if it occurred. He testified that the plaintiff came running for the train with another young man with him; that the train was moving when he passed his stand; that several of the cars had passed the street corner; that the plaintiff ran out and attempted to board the train at the opening between the fifth and sixth cars; that he failed in the endeavor to get aboard, fell, and was dragged. The flagman at the station testified to the same. Then a young lady, who was going to the station to board a train, testified that the plaintiff attempted to board a moving train, fell, and was injured in that manner. These witnesses testified in a straightforward, honest manner. The only interest shown by any of them in the matter was the employment of the flagman by the defendant and the fact that the newsman had

at one time been employed by the defendant and had news stand at or near one of the defendant's stations.

The defendant called in addition to these witnesses, a witness who concededly was with the plaintiff at the time of the happening of the accident. He was a young man not particularly prepossessing, and whose appearance indicated that his intellect was not specially strong. He at first testified to the happening of the accident in about the manner detailed by the plaintiff; but during all the time that he was testifying his appearance upon the stand was such as to impress any observer, having any knowledge of human nature, that he was testifying falsely. His head hung down, his eyes were fixed upon the end of the stenographer's desk, and never once did he look his interrogator in the face. It was not long before he became involved in difficulties, and after a few questions by the court confessed that the story he was telling was not true. He then went on and told a story which coincided with the testimony given by the newsman and the other witnesses for the defense. As soon as he admitted that he had been testifying falsely and started to tell the other story, his demeanor instantly changed, and from that time on he was free and easy in his position and movements in the witness chair. He looked directly at the person who asked him questions, and it was plainly evident that a load had been lifted from his mind. In addition to testifying to the happening of the accident in the manner claimed by the defendant, his attention was called to an occurrence immediately after the accident happened, when the plaintiff had been carried into a neighboring saloon and laid upon the floor (the plaintiff had previously testified that he was entirely conscious during all this time), and the policeman present asked how the accident happened, and this witness said in the presence of the plaintiff:

"I told him not to take the chance. I would not take the chance."

This happening was testified by one or two other witnesses. It plainly indicates how the accident did happen. It was the involuntary exclamation of this witness before he had time to prepare any story. The witness then admitted upon the stand that he had told numerous other persons this story of the happening of the accident, in which he had told practically the story which he just told upon the stand; but to my mind this came about, not because of any evil design on the part of this witness, but rather through the weakness of his character. When he went to see the young boy's parents he did not have the courage to say that it was Michael's fault and to sooth and solace he said it was not Michael's fault. Having thus committed himself to that story, he never found the opportunity or plucked up sufficient courage to tell the truth until he was interviewed by some one on behalf of the railroad company and was urged to tell the truth, taken to another witness who saw the accident, and he then told the story as he subsequently told it upon the stand.

The minutes of the testimony have not been furnished me upon this motion, and this review of the testimony is entirely from memory and at a period some weeks after this trial; but I had the same impression then as to the verdict being against the weight of evidence as I

have now.   Under all these circumstances I feel that it is no injustice to the plaintiff to require that the matter be submitted to another jury.

Motion to set aside the verdict as against the weight of evidence granted, upon payment of the usual cost.